HANNAH DINNEBEIL, complainant-respondent,

*v.*

GEORGE L. DINNEBEIL, defendant-appellant.

[Submitted October term, 1931. Decided February 1st, 1932.]

*Mr. Frederic M. P. Pearse,* for the appellant.

*Mr. Alexander Simpson,* for the respondent.

The opinion of the court was delivered by

WELLS, J.

The complainant-respondent filed a bill in the court of chancery under section 26 of the Divorce act, in which she charged that her husband, the defendant-appellant had, since April 8th, 1929, deserted and abandoned her without justifiable cause and had refused and neglected to maintain and adequately provide for her.

Defendant-appellant denied the material allegations of the bill and filed a cross-bill, in which he sought a divorce from his wife on the ground of extreme cruelty.

The advisory master, before whom the case was heard, advised a decree dismissing the cross-bill of the defendant and sustaining the complainant's bill for maintenance with an allowance of $20 a week to the complainant, and counsel fees and costs, and from the decree entered in accordance with this finding, the defendant has appealed.

"The law is well settled that to entitle a wife to alimony under section 26 of the Divorce act, two elements must occur; first, the husband must, in the language of the statute, without any justifiable cause, abandon his wife or separate himself from her; and, second, he must refuse or neglect to maintain and provide for her." *Margarum* v. *Margarum,* 57 N. J. Eq. 249; *Biddle* v. *Biddle, 104 N. J. Eq. 313.*

"The conditions [other than adultery] which will justify a husband in separating himself from his wife, and refusing her support and maintenance, are those which our Divorce act (*Comp. Stat. p. 2021*), has provided as a sufficient cause for the court to grant to the husband a divorce from bed and board, namely extreme cruelty upon the part of the wife. And when a husband separates himself from his wife, and she claims suitable support and maintenance under section 26 of the Divorce act, he must justify that separation by proof of extreme cruelty upon the part of his wife to the same extent as he would be compelled to prove if he were suing for a divorce from bed and board on the ground of extreme cruelty...

" 'Extreme cruelty,' as used in our Divorce act is such cruel conduct as endangers the safety of the person or the health of the aggrieved party, either actually inflicted or

reasonably apprehended." *Taylor* v. *Taylor, 73 N. J. Eq. 745; Cavileer* v. *Cavileer, 94 N. J. Eq. 160; McLean* v. *McLean, 104 N. J. Eq. 208.*

The first question to be determined, therefore, is whether or not the separation of the appellant from his wife was legally justified; whether the conduct of his wife toward him was the cause of that separation and if so, whether that conduct amounted to extreme cruelty within the meaning of the decisions of this court. If these questions are answered in the affirmative, then appellant is entitled to a divorce under chapter 187 of *P. L. 1923,* known as the Blackwell act.

The parties were married in 1904, and two children were born of the marriage, both of whom are now adults and self-supporting. The marital troubles commenced within two years after the marriage and as a result, they separated, apparently by mutual consent, and while they occasionally saw each other and cohabited at infrequent intervals, yet they lived apart almost continuously until November 4th, 1928, and during all this period, the appellant regularly contributed to the support of his wife and children.

The wife, however, during the separation did not allow her husband to forget her. She instituted at least four proceedings against him in the domestic relations court of New York for the purpose of harassing him into paying her more money. These domestic court cases were at times mingled with criminal complaints, in which she accused him of white slavery and similar charges. All of the criminal cases were dismissed and most of the domestic relations cases were settled by agreements between the parties or by the judge with their consent, and the appellant continued to pay the allowance agreed upon.

In May, 1927, respondent brought a suit in the New York courts against appellant for divorce on the ground of adultery, in which she asked for alimony *pendente lite.* This was denied because appellant was then and had been supporting her. The divorce suit was not pressed and was finally dismissed.

Thus matters continued until September, 1928, when the respondent and appellant agreed to resume living together in

Metuchen, New Jersey, and on November 4th, 1928, moved
into a house belonging to The Modern Building Company,
by which the defendant was then employed. Within two
days, however, a violent quarrel occurred in which respondent
accused the appellant of going off with a woman who had
called by appointment to see about some work to be done in
one of the houses owned by the company.

The testimony shows, and the respondent admits, that she
lost her temper because of something the appellant said con-
cerning the "fine shape" of this woman, and this caused her to
think it was another woman, with whom she had accused
appellant of being intimate and that is the reason she said
harsh things to him. The sister-in-law of appellant, how-
ever, that same evening, succeeded in bringing about a recon-
ciliation, and the appellant, who had left his home to go to
his brother's house, returned.

The appellant also claims that on Thanksgiving eve, 1928,
as he was about to leave his home to go on a business trip,
his wife accused him of intending to go out with some woman,
used vile and offensive language and ran down to the garage
and started to cut the tires on his automobile, and was pre-
vented from doing this by her son, and it was necessary to
bring in a police officer to subdue her.

Respondent admits trying to cut the tires and says her
husband had told her he was going out with another woman
and she did this to prevent him.

Appellant claims that a short time before Christmas eve,
when he was about to leave the house, she again abused him,
accusing him of going away to meet a woman and striking
at and kicking him, and finally went for a knife when de-
fendant left the house and remained away for some time.
She admits the quarrel but denies she abused him or used
physical violence upon him. She says the cause of the trouble
was his statement that he was going to see an old "friend,"
referring to a woman of which she was jealous. That on
another occasion she fired a shot at him from a revolver
while he was lying on the couch. She denies this and says
he fired the shot to scare her; appellant says that on her
birthday his wife accused his father of forging his birth cer-

tificate to conceal the fact that appellant was a bastard. She admits there was a quarrel over their respective ages in which she jokingly said his father changed his birth certificate. On these occasions, appellant claims he was required to go to his brother's home and would be in a highly nervous condition. He would finally return, sometimes after remaining away several days. Appellant says that some time in the month of March, 1929, he and his wife agreed to move into a home where the rent would be $30 instead of $50 per month and that on April 8th, 1929, he came into the house to get some tools to work on the new home, whereupon the respondent became incensed and insisted that she would not leave the home they were then occupying, and she started to tear his overalls off and threatened to kill him, and he left the respondent, and went to live with his brother and did not return. Her version of this is that he came home intoxicated and said he was going to go with the other woman. She begged him not to go back to the other woman for the children's sake, but to come up stairs and lie down, but he said, "no, I hate you and I hate your body," and that he left and never returned except to remove his personal belongings.

In May, 1929, when he went for his trunk and personal belongings, appellant claims he was required to take officers for his protection and that she tried to prevent them from entering the house, and resisted every effort made to remove anything therefrom.

The appellant claims that for many years he has been suffering from a nervous disorder and stomach trouble, alleging that in 1906 he weighed 196 pounds, and that now he weighs only 145 pounds and that the effect of this constant quarreling and these unjust accusations seriously undermined his health; that he had undergone an operation and is still suffering from nervousness, and is being constantly treated by physicians for stomach trouble.

Appellant places great weight upon two letters written by respondent to appellant, one on January 27th, 1929, and the other on January 30th, 1929, in which respondent admits calling appellant vile names, attacking his automobile tires and promises to move into cheaper quarters and be a real wife

and make life pleasant for him and cater to his needs, knowing that he was a sick man. Both of these letters were composed by appellant and signed by respondent at his request, and exacted of her by him, as a condition upon which he would return to her after a two weeks' absence caused by a quarrel between them. We are not greatly impressed with the importance of such letters, written under such circumstances.

Appellant, realizing that he had an exceedingly jealous wife, could not resist the temptation to occasionally refer to the face or figure of some woman of whom he knew his wife was jealous, or to show her a photograph of a woman and remark, "isn't she nice," well knowing that such remarks or actions would arouse her to a fighting fury. Many of his wife's outbursts of temper would probably not have occurred had he not provoked them by what he said or left unsaid.

Upon his return from his frequent absences, his replies to her inquiries as to where he had been were, "it's none of your business," or words to that effect. This, to say the least, was not pouring oil upon the troubled waters.

Taking all these things into consideration we have reached the conclusion, after a careful examination of the voluminous record, that it is not clearly established that the respondent's treatment of her husband under the peculiar circumstances of this case is such as to entitle him to a divorce from her on the ground of extreme cruelty.

Therefore, in so far as the decree of the court of chancery dismisses the cross-bill of appellant, it should be affirmed.

This leads to the consideration of the second question involved, namely, as to whether the respondent is entitled to separate maintenance.

Before the respondent can succeed in her suit for maintenance she must show (as we have already said) not only that appellant had abandoned or deserted her but that he also had refused or neglected to maintain and provide for her in accordance with the requirements of the statute, and the question reserved is whether the complainant has succeeded in that part of her case.

"The sense in which the legislature used the words, 'refuse

or neglect to maintain and provide for her,' is shown by what immediately follows where this court is given power to order such suitable support and maintenance as the nature of the case and the circumstances of the party render suitable and proper in the opinion of the court. It seems clear enough that it is the duty of the court, under circumstances like the present, to determine whether the amount already provided by the husband for the wife is such as the nature of the case and the circumstances of the parties render suitable and proper." *O'Brien* v. *O'Brien, 49 N. J. Eq. 436; Calabrese* v. *Calabrese, 104 N. J. Eq. 450.*

. While the appellant cannot justify his leaving his wife because of her extreme cruelty, yet it clearly appears from the evidence that his absence from the home was not against her wishes. She was apparently perfectly satisfied with the arrangement except that from time to time she demanded and obtained larger weekly allowances, and whatever chances of a reconciliation there might have been were destroyed by her hailing him into the domestic relations courts, the criminal courts and the divorce courts, on complaints which were for the most part dismissed forthwith.

Through the entire period of separation from 1906 to November, 1928, appellant had paid respondent regularly a weekly sum, first $8 per week, then $10 per week, and since 1917, $12 per week, and since the final separation in April, 1929, $15 per week.

The testimony shows that not once did appellant miss making these payments. The checks were offered in evidence and not questioned.

The appellant for the last three years has been making $40 per week; prior to that $33 a week or less.

He owns one share of stock in The Modern Building Company, for which he paid $100. This company has been making no money for several years. He owns ten shares of building and loan stock with five years to run which is hypothecated for moneys borrowed to pay for a serious operation. His bank balance is seldom higher than $15. That he is not a well man is clearly shown by the testimony.

The respondent offered no testimony to show what her circumstances were and gave no reason why a larger sum than that which appellant has continued to pay her since the separation is necessary for her proper maintenance.

This court said in *Dietrick* v. *Dietrick, 88 N. J. Eq. 560,* that—

"No rigid standard can be set up whereby to measure in every case the amount of permanent alimony for the support of the wife, but it is usually about one-third of the husband's income. The amount is not fixed solely with regard, on the one hand, to the actual needs of the wife, nor, on the other, to the husband's actual means. There should be taken into account the physical condition and social position of the parties, the husband's property and income [including what he could derive from personal attention to business], and also the separate property and income of the wife. Considering all these, and any other factors bearing upon the question, the sum is to be fixed at what the wife would have a right to expect as support, if living with her husband."

We have no hesitation in saying that the sum the appellant has been paying respondent is all, if not more, than she would have a right to expect as support, if living with him.

We are of the opinion, therefore, that at no time has the appellant since the separation refused or neglected to provide a support for his wife suitable to his income and that the amount provided by him for his wife is such as the nature of the case and circumstances of the parties render suitable and proper.

This leads us to conclude that there was no reason for a compulsory order upon appellant to force him to support his wife and that the decree entered in the court of chancery should in that respect be reversed.

*For affirmance*—None.

*For reversal*—THE CHIEF-JUSTICE, TRENCHARD, PARKER, CAMPBELL, LLOYD, CASE, BODINE, DALY, DONGES, VAN BUSKIRK, KAYS, HETFIELD, DEAR, WELLS, KERNEY, JJ. 15.