Marie P. Adams, complainant,

*v.*

Peter A. Adams, defendant.

[Decided August 17th, 1939.]

*Messrs. Collins & Corbin,* for the complainant.

*Mr. John Milton* and *Messrs. Evans, Smith & Evans,* for the defendant.

Stafford, A. M.

The complainant in this maintenance suit filed a bill in the court of chancery under section 26 of the Divorce act, in which she charged that her husband, Peter Adams, had, since June 20th, 1936, abandoned her without justifiable cause, and had refused and neglected to properly maintain and provide for her and the children of their marriage.

The bill furthermore set up that the defendant had fraudulently obtained a decree of divorce against complainant in the court of the first instance at Athens, Greece, on or about April 12th, 1934.

This bill was subsequently amended, and a third cause of action added, wherein the complainant petitioned the court to order the defendant to pay to the complainant the sum of two thousand and one ($2,001) dollars due under the

terms of an agreement made by and between complainant and defendant on or about April 25th, 1935.

Defendant answered both the original and amended bill of complaint, and in his answers denied the material allegations set forth therein.

Issue was joined and the matter came on for a final hearing.

Marriage and residence have been amply proved and corroborated.

The issue of abandonment has been practically admitted by the defendant because he failed to introduce evidence to justify his separation from the defendant. However, defendant denies the allegations that he had refused and neglected to maintain and adequately provide for the complainant and the children of their marriage.

Defendant, in answering the third cause of action in the amended bill of complaint, charges that the said agreement of April 25th, 1935, is void as against public policy, and that it was an agreement made for maintenance while the parties were living together as man and wife, and further that there was no consideration to uphold the said agreement.

The parties were married on or about the 26th day of August, 1918, and the following children were born of the said marriage, namely: Arthur P. Adams, age sixteen years; Stewart Adams, age fifteen years; Jean Adams, age ten years, and Nicholas P. Adams, age twenty-three months, all of whom are in the custody of the complainant at the present time.

The evidence reveals that in the year 1933 complainant and defendant, with their three children, Arthur Adams, Stewart Adams, and Jean Adams, made a trip to Europe, and it was while they were on this apparent pleasure jaunt that the defendant commenced divorce proceedings against the complainant, charging her with the crime of adultery.

Upon learning of this fact the complainant immediately left Greece and arrived in the United States sometime in December, 1933, with her son Arthur, and resumed residence in the city of Paterson, where she has resided ever since.

A maintenance suit started in the court of chancery was discontinued and the parties entered into an agreement dated

April 25th, 1935, whereby the defendant agreed to apply to the court of the first instance at Athens, Greece, to set aside the Grecian divorce decree obtained by him against the complainant; also, resume cohabitation with complainant in the city of Paterson and pay her one hundred and eighty-eight ($188) dollars per week; also, make complainant beneficiary in a life insurance policy amounting to the sum of twenty-five thousand ($25,000) dollars; also, deliver to complainant a deed to the property known as 540 Fifteenth avenue, in the city of Paterson, county of Passaic and State of New Jersey.

The defendant observed all the conditions of this agreement, with the exception of the payment of the sum of one hundred and eighty-eight ($188) dollars each week. Without the consent of the complainant he reduced this sum to one hundred ($100) dollars each week.

The parties resumed and continued cohabitation in the city of Paterson from April, 1935, until December, 1935, at which time the defendant left on a trip, and did not return until the month of June, 1936. On June 20th, 1936, the abandonment took place, since which time the parties have not resided together.

While the defendant has seen fit not to contest the charges of abandonment, the court holds, upon the facts, that an abandonment actually took place. However, it is incumbent upon the complainant not only to sustain her allegations of abandonment, but she must also sustain her charge that the defendant refused or neglected to maintain and provide for her.

The defendant, with his brother, Adam Adams, in their early youth, and apparently through their own efforts, rose from a menial and lowly position in life to one of promise in the moving picture industry. As his financial condition improved, his family mode of living correspondingly kept pace with his business successes.

There can be no doubt, from the evidence, that prior to the commencement of their marital difficulties the defendant was a good father, husband and family provider. He was not only interested in the comfort and convenience of his family, but was very much interested in the proper and neces-

sary education of his children. The family had two automobiles, and he was giving the complainant a weekly allowance of two hundred ($200) dollars. Mrs. Adams lived in a large, comfortable home, had accounts in the expensive department stores in New York City, and every summer enjoyed the pleasure of a summer vacation. Two children attended private school, one at Lawrenceville, and one at Princeton University.

The conclusion is inescapable, that prior to the commencement of family disturbances, the defendant had been a lavish husband and father. He had gradually raised the standard and mode of living of the family as his financial worth increased, and prior to the family's trip to Greece, the high cost of maintaining and caring for his wife and children caused him no worry or complaints.

The trip to Greece evidently brought about a complete change in his family relations and his finances.

The final separation took place on or about June 20th, 1936. From that date until October 1st, 1936, the defendant paid complainant the sum of one hundred and twenty-five ($125) dollars each week, and from October 1st, 1936, to December 24th, 1936, the defendant paid the complainant the sum of one hundred ($100) dollars each week. On December 23d, 1936, this court made a preliminary allowance *pendente lite* to the complainant in the sum of two hundred ($200) dollars each week, and the defendant has obeyed the order of the court in this regard.

The evidence shows the complainant has no means or income other than that provided for her by the defendant.

The mere fact that the husband fixed a sum of money to be given to his wife for her support and maintenance will not divest the court of chancery of the jurisdiction conferred by statute, if this sum is insufficient for her proper support. *Calabrese* v. *Calabrese, 104 N. J. Eq. 450; 146 Atl. Rep. 330.*

In *"Exhibit D-6,"* which is a report of the net worth and income of Peter A. Adams, it is specifically set forth on page 19 that the total income of Peter A. Adams for the years 1932, 1933, 1934, 1935 and 1936 were as follows: 1932, $24,537.98; 1933, $19,479.34; 1934, $14,754.49; 1935, $20,639.85;

1936, $28,213.38. Deductions were not included in these figures.

"*Exhibit D-7*," which is a supplemental report on the net income of Peter A. Adams for the year 1937 shows that his total income for 1937 was $38,537.76. Deductions are not included in this figure.

These figures indisputably show that the defendant's total income was on the increase from the year 1935 up to and including the year 1937.

Prior to the filing of the bill in the instant case, the defendant apparently encountered very little difficulty in providing ample funds for his wife's comfort, which funds enabled her to not only bring up her family, but to enjoy a standard and scale of living apparently commensurate with the financial qualifications of the defendant.

However, after marital difficulties put in an appearance, it is clear from the evidence that the defendant then decided to lower the scale and standard of living which the complainant enjoyed, giving as a reason, not only a marked decline in his financial condition and annual income, but a serious decline in his physical condition due to an ever present heart condition.

During the pendency of the instant suit the defendant sold his stock in the Essex Amusement Company to his brother, Adam Adams, for the sum of fifty thousand ($50,000) dollars. In the year 1937 the defendant enjoyed through this particular stock a salary of fifteen thousand ($15,000) dollars, and a dividend of sixteen thousand ($16,000) dollars.

Defendant and his brother, Adam Adams, during the pendency of this suit, entered into an agreement whereby the defendant surrendered to his brother, Adam Adams, his fifty per cent. interest in the numerous enterprises in Newark, New Jersey, and his brother, Adam Adams, transferred to the defendant his fifty per cent. interest in the numerous Paterson enterprises.

The reason for this change of interests was stated that the complainant's legal activities had interfered with the numerous business activities of the Adams brothers, and that unless

such a division took place the legal undermining of the business ventures might result in irreparable damage and injury to the assets of the various corporations in which both brothers were interested.

The complainant charges that the transfer of the defendant's interest in the Essex Amusement Company for the sum of fifty thousand ($50,000) dollars, and the transfer of his fifty per cent. interest in the Newark corporations were based upon a fraudulent attempt on his part to dissipate the assets of the defendant during the pendency of this suit; that the transactions were not *bona fide,* but brought about solely for the purpose of materially decreasing his financial worth in an effort to influence the court concerning his financial qualifications with regard to the support of his wife and children.

The comparison of the value of the Paterson holdings, which Adam Adams conveyed to the defendant, and the value of the holdings in the Newark properties which the defendant conveyed to his brother, Adam Adams, leads the court to believe that Adam Adams got the better of the bargain.

A minute resume of the testimony would lead to a prolonged discussion of financial worth and value, which would serve no useful purpose. Suffice it is to say that the Adams brothers' holdings in the Newark properties far exceeded in value the Adams brothers' holdings in the city of Paterson.

The complainant charges that these assets were conveyed by the defendant to his brother, Adam Adams, in order to waste his estate and defeat complainant's claim for separate maintenance. She charges that the defendant willingly entered into these agreements with his brother for the sole purpose of depriving the complainant of her rights under the law. However, she does not petition the court to set aside these alleged fraudulent transfers and conveyances between the defendant and his brother. She is neither a creditor, nor has she in her possession a decree, and the alleged fraudulent transferee, Adam Adams, is not a party to these proceedings. *Clark* v. *Clark, 13 N. J. Mis. R. 49; 176 Atl. Rep. 81.*

She asks that all of the assets and property rights, which were, as she claims, fraudulently conveyed by the defendant to his brother, Adam Adams, to defeat complainant's claim

for separate maintenance, be regarded and considered in settling the allowance, if any, granted to complainant.

There must be factual basis for determining a transfer or conveyance fraudulent; it cannot rest upon a mere suspicion, presumption or conjecture, and the husband's income, assets and holdings must be established by competent evidence. But if it is determined that the assets and holdings of the husband were fraudulently conveyed by him to his brother, Adam Adams, to defeat the wife's claim for separate maintenance, then these properties and holdings should be considered by the court in making and settling an allowance. Fraud, however, can never be presumed; it must be proved. *Grobart* v. *Grobart, 119 N. J. Eq. 565; 182 Atl. Rep. 630.*

During the pendency of this suit the defendant saw fit to convey his interests in the Essex Amusement Company and his holdings in the Newark corporations. If this case were not pending, the defendant's conveyance of his interest in the Essex Amusement Company for the sum of fifty thousand ($50,000) dollars, out of which interest he not only enjoyed a salary of fifteen thousand ($15,000) dollars, but a dividend of sixteen thousand ($16,000) dollars, would lead one to believe that this very successful business man was suddenly bereft of his business acumen and in a moment of abandonment and thoughtlessness had recklessly entered into a contract without giving the matter much thought or concern. But the defendant was a very capable, intelligent and successful individual. What he did in this particular instance he did after giving the matter weighty consideration, and if this is so, the conclusion is inescapable that he had an ulterior motive in so doing, and that was to attempt to discard a burden which the law cast upon him of supporting his wife and children in a proper and suitable manner, according to his means. The fact that this conveyance took place while his wife was suing him for support and maintenance in this court is evidence of fraudulent intent.

The same reasoning applies to his conveyance of his holdings in the Newark properties to his brother, Adam Adams.

The defendant alleged that he was unable, for a long period of time, to actively attend to his business affairs and gave as

a reason for his inactivity a heart condition which compelled him to cease his business activities and seek health and quiet in Saratoga, Florida, and other health restoring and life sustaining environments. In fact, his loss of health was one of his main reasons for disposing of his holdings in the Essex Amusement Company to his brother, Adam Adams, for the sum of fifty thousand ($50,000) dollars.

While it is true that the evidence does show the defendant was suffering from a heart ailment of some character or description, proof was utterly lacking to prove that it was of such a grievous or grave nature as to endanger his health were he to continue his activities as he had done before his marital difficulties put in an appearance. This fact has not been established by such clear and convincing proof as would relieve the court of its perplexed condition of doubt that such was the case.

It is worthy of note that although the defendant carried several insurance policies containing disability clauses which would have entitled him to substantial compensation by reason of his physical disability, yet the record is barren of any evidence showing an effort on his part to file an application claiming this substantial compensation on account of his physical disability.

I am convinced that the condition of the defendant's health after family troubles arose was no different than the time when both parties were living happily together and he was showering upon his wife, without complaint, not only great comforts and conveniences but many luxuries as well.

The defendant not only disposed of a large part of his assets but he abandoned the field of his activities wherein he enjoyed great financial benefits. The complainant challenges the industry, earning power and willful and wanton lack of business activity on the part of the defendant in order to avoid his marital obligation of support.

In determining the matter of alimony to be awarded the court may take into consideration not only the husband's property and income, but also his capacity to earn money from personal attention to business. If this were otherwise a husband, by deliberate intent or disinclination to work,

might avoid his marital obligation of support. *Robins* v. *Robins, 106 N. J. Eq. 198; 150 Atl. Rep. 340.*

In *Pinkinson* v. *Pinkinson, 91 N. J. Eq. 281; 109 Atl. Rep. 731,* the defendant was earning $75 a week. After suit was brought against him by his wife, he resigned his position and at the final hearing informed the court he had no employment. The court held: "I think this resignation, was the result of a thought that it would have a bearing, advantageous to him, on the amount this court would award the complainant, because he says he thinks he can go back to his old posi-- tion. I believe his earning capacity is $75 per week."

In *Dietrick* v. *Dietrick, 88 N. J. Eq. 560; 103 Atl. Rep. 242,* the court, in determining the amount of permanent alimony to be allowed for the support of the wife, said: "There should be taken into account the financial condition and social position of the parties, the husband's property and income (including what he could derive from personal attention to business)." To the same effect, *Dinnebeil* v. *Dinnebeil, 109 N. J. Eq. 594; 158 Atl. Rep. 475.*

No rigid standard can be set up whereby to measure in ·every case the amount of permanent alimony for the support of the wife. The amount is not fixed solely with regard, on the one hand, to the actual means of the wife, nor, on the other hand, to the husband's actual means. There should be taken into account the physical condition and social position of the parties, the husband's property and income, including what he could derive from personal attention to business, and also the separate property and income of the wife. Considering all factors bearing upon the question, the sum is to be fixed at what the wife would have the right to expect as support if living with her husband. *Dinnebeil* v. *Dinnebeil, supra.*

The complainant is entitled to an allowance commensurate with the allowance granted to her by her husband which apparently satisfied her requirements while they were living together. She is entitled to be maintained on the same basis mutually agreed upon by the parties and found satisfactory before family troubles put in an appearance. She is not entitled to support on a more luxurious scale than that to

which she had been accustomed during their happy married life. Providing of course the financial qualifications of the husband have not suffered such a noted decrease as to make this allowance too great a burden for him to sustain. She is entitled to a sum sufficient to properly maintain and support her and the children of their marriage in the same manner which she enjoyed and which apparently satisfied her during the years of her married life.

While living together the complainant enjoyed the use of a Cadillac automobile and had charge accounts in expensive stores in New York City. She received two hundred ($200) dollars a week from the defendant, out of which she paid seventy ($70) dollars or eighty ($80) dollars for food, twenty ($20) dollars to a maid, twenty-five ($25) dollars for clothing, some expenses for laundry work, and some little luxuries.

The defendant, on the other hand, paid the taxes on the home, insurance premiums, fuel bills, automobile expenses, costs of vacations, camp for the boys, trips to the shore and the mountains, and also tuition fees for two of the children in private schools. The complainant testified that the defendant told her the European trip to Greece cost between ten thousand ($10,000) dollars and fifteen ($15,000) thousand dollars.

It is apparent, from the above facts, that while the parties were living happily together the defendant not only was not worried or harassed about family expenses, but satisfied the family's every whim and desire uncomplainingly. When love flew out the window the defendant's physical condition and financial structure underwent a metamorphosis. The liberal and extravagant husband and father immediately became the begrudging and discontented spouse and parent.

I am of the opinion that the complainant has sustained the allegations contained in her bill of complaint; that on June 20th, 1936, defendant did abandon her without justifiable cause and did neglect to properly provide and maintain for her and the children of the marriage.

I also find that the defendant, were he so inclined, could still be the recipient of the same income as that which he enjoyed prior to the commencement of the family disturbances which resulted in a separation.

The complainant is entitled to and should receive an allowance sufficient to properly maintain and support her and the children of the marriage, not an allowance which would make the separation attractive, but an allowance which would permit her to live according to that scale and standard which she enjoyed and which apparently satisfied both herself and her husband during the years of their married life.

I will advise a decree allowing the complainant the sum of two hundred ($200) dollars each and every week, to be paid by the defendant to the complainant for her support and maintenance, and for the support and maintenance of the children of the said marriage.

During the pendency of the first maintenance suit commenced by the complainant against the defendant the parties came to an understanding which resulted in the agreement dated April 25th, 1935, above referred to.

The complainant, on her part, agreed to discontinue and did discontinue the then pending maintenance suit, and the defendant did pay to the complainant the sum of one hundred and eighty-eight ($188) dollars each week until June 20th, 1936. From June 20th, 1936, until October 1st, 1936, the defendant paid to the complainant the sum of one hundred and twenty-five ($125) dollars each week, and from October 1st, 1936, to December 24th, 1936, the defendant paid to the complainant the sum of one hundred ($100) dollars each week.

Complainant alleges that under the aforesaid agreement of April 25th, 1935, there is due and owing to her the sum of two thousand and one ($2,001) dollars, because defendant failed to live up to his agreement to pay her the sum of one hundred and eighty-eight ($188) dollars each week. The order of this court allowing complainant *pendente lite* the sum of two hundred ($200) dollars each week was dated December 23d, 1936.

The court of chancery has exclusive jurisdiction over contracts entered into between husband and wife. While at law agreements between husband and wife are void, in equity such agreements will be recognized, and will be enforced if fair and fairly obtained. There is nothing in this agreement

which would lead the court to believe that it was immoral or against public policy; in fact, the court is of the opinion that at the time the contract was entered into by and between the complainant and defendant on April 25th, 1935, the terms were fair and the contract was fairly obtained, and, since which time, the court is not convinced that circumstances have arisen which would make the enforcement of said agreement inequitable. *Cohen* v. *Cohen, 121 N. J. Eq. 299; 188 Atl. Rep. 244.*

The complainant has sustained her allegations set forth in the third cause of action and is entitled to the sum of two thousand and one ($2,001) dollars, which is the total amount of the arrearages due to complainant by defendant under the terms of the agreement dated April 25th, 1935.

A decree in conformity with the above findings may be presented.